NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3827
_____

MACK TRUCKS INC.,
Appellant

v.

BORGWARNER TURBO SYSTEMS, INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 08-cv-02621
(Honorable Harvey Bartle III)
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
September 10, 2012

Before:  SCIRICA, ROTH and BARRY, *Circuit Judges*.

(Filed: December 21, 2012)
_____

OPINION OF THE COURT
_____

SCIRICA, *Circuit Judge*.

Plaintiff Mack Truck, Inc. ("Mack") appeals the District Court's grant of summary

judgment in favor of Defendant BorgWarner Turbo Systems, Inc. ("BorgWarner") on

Mack's breach of express warranty and breach of contract claims due to alleged design

defects.  We will affirm.

1

I.

Mack and BorgWarner entered into a "Supply Agreement," dated December 6, 2002, in which BorgWarner agreed to manufacture and supply turbochargers for use in Mack's truck engines. Section 9(b) of the Supply Agreement provides:

> BorgWarner's warranties to Mack regarding the Products are set forth in Annex V, attached hereto and incorporated herein. Notwithstanding anything else in this Agreement or the Annexes to the contrary, BorgWarner warrants that the Products shall, for the period of time defined in Annex V from the date placed in to service, be of good material and workmanship and shall conform to the specifications agreed upon by the parties . . . .

J.A. vol. II, A78-79.[1]

On July 8, 2003, the parties added Annex V to the Supply Agreement. Annex V is titled the "Product Warranty Terms and Conditions." *Id.* at A103. Paragraph F of Annex V states, "BorgWarner shall only warrant products that have a signed application sheet and that do not exceed their limits while in operation in the field." *Id.* The parties agree the "signed application sheet" refers to a document also called the "Product Application Agreement" ("PAA").

---

[1] Annex V, paragraph A repeats these warranties, stating "Borg Warner warrants to Mack (with the exceptions noted in Annex VII [sic], that the Products will conform to the specifications provided to Borg Warner by Mack, and to any other technical requirements agreed upon by the parties. Borg Warner also warrants to Mack that the Products will be free of defects in material and workmanship in normal use and service." J.A. vol. II, A103. It conspicuously disclaims all other warranties, including the implied warranties of merchantability and fitness for a particular purpose. *Id.*

2

The parties had already entered into a "Conditionally Approved" PAA, dated October 31, 2002, memorializing the specifications for a "pilot" line of turbochargers.[2] *Id.* at A172-78. After executing the Supply Agreement, the parties attempted to negotiate a second non-conditional PAA that would establish specifications for turbochargers under the Supply Agreement. Negotiations lasted into 2004, but the parties never reached an agreement.

During and after these negotiations, BorgWarner continued to provide Mack with turbochargers for its truck engines pursuant to the Supply Agreement. But BorgWarner expressed to Mack its position that unless they both agreed on and signed a second PAA, Mack would have no design warranty coverage on the turbochargers. BorgWarner made clear Mack would still have warranty coverage for material and workmanship. Mack did not expressly assent to this understanding of the warranties, but Mack's internal emails demonstrate Mack was aware BorgWarner did not intend to provide warranty coverage unless a second PAA was signed.

Once the turbochargers reached Mack's consumers, they began to fail at high rates. Mack ultimately paid over $45 million to its customers from warranty claims brought through August of 2008. BorgWarner reviewed the customer claims, provided Mack with monthly summaries documenting the "condition codes" under which

---

[2] Because Mack was designing the engines in which BorgWarner's turbochargers were a component, Mack and BorgWarner had to agree to certain "specifications," such as the maximum oil supply temperature and the maximum allowable shaft speed, which describe the environmental limitations within which the turbochargers would operate.

BorgWarner categorized each claim, and ultimately reimbursed Mack for nearly $4.5 million of these claims.[3]

Mack brought suit against BorgWarner for breach of contract and breach of warranty for failing to reimburse the remaining portion of claim payments allegedly due to BorgWarner's design defects. The District Court found BorgWarner had made two express warranties to Mack. First, a specifications warranty covering the design of the turbochargers. Second, a material and workmanship warranty covering "deficiencies in the execution of the design." *Mack Trucks, Inc. v. BorgWarner Turbo Sys., Inc.*, No. 08-2621, 2011 U.S. Dist. LEXIS 29680, at *12 (E.D. Pa. Mar. 22, 2011). The District Court held the signed application sheet, or PAA, was an unambiguous condition precedent to warranty coverage by BorgWarner. The court found BorgWarner waived the condition precedent with respect to material and workmanship claims, but not with respect to design claims. Since Mack and BorgWarner never agreed on a second PAA, the design warranty never became effective. Therefore, the District Court granted summary judgment for BorgWarner with respect to Mack's breach of express warranty and breach of contract claims for alleged design defects.

The District Court also denied Mack's motion for reconsideration. Mack asserted the District Court had failed to consider the Lewis declaration as evidence BorgWarner intentionally hindered negotiations of the second PAA to avoid warranty liability. The District Court rejected this argument, stating the Lewis declaration did not show

_____

[3] Mack has added additional claims from September of 2008 through February of 2010 as a supplement.

4

"BorgWarner abused a power to specify terms or negotiated with Mack in bad faith."

*Mack Trucks, Inc. v. BorgWarner Turbo Sys., Inc.*, No. 08-2621, 2011 U.S. Dist. LEXIS 49132, at *3 (E.D. Pa. May 6, 2011).

II.[4]

For purposes of this appeal, we assume the turbochargers supplied by BorgWarner failed because of design defects. Mack asserts the District Court erred in granting summary judgment to BorgWarner because the material and workmanship warranty—for which BorgWarner has agreed to reimburse claims—includes design defects, or, in the alternative, because the contract is ambiguous and should be interpreted with the benefit of a complete record. In addition, Mack contends BorgWarner waived any purported condition precedent of a signed PAA by paying on customers' warranty claims and by negotiating the second PAA in a bad faith attempt to avoid warranty liability.

A.

Whether a contract is ambiguous is a question of law to be decided by the court. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994)

---

[4] The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291, as this is an appeal from final judgment. "[O]ur review of a grant of summary judgment is plenary." *Koshatka v. Philadelphia Newspapers, Inc.*, 762 F.2d 329, 333 (3d Cir. 1985). We must determine if the movant has shown "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It should be noted that although the language of Rule 56 was amended after the filing of this case, "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56(a) advisory committee notes. The parties agree Pennsylvania law governs the interpretation of this contract.

(applying Pennsylvania law).  "To decide whether a contract is ambiguous, . . . we 'hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'"  *Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) (alteration in original) (quoting *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991)).  We look to "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation.  Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning."  *Id.* (citations omitted).  An unambiguous contract may be construed by the court as a matter of law, including on motion for summary judgment, whereas an ambiguous contract must be interpreted by the factfinder.  *Allegheny*, 40 F.3d at 1424.

Certain rules of construction guide our analysis of the contract.  The Supreme Court of Pennsylvania has defined a condition precedent in a contract as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."  *Shovel Transfer & Storage, Inc. v. Pa. Liquor Control Bd.*, 739 A.2d 133, 139 (Pa. 1999) (quoting *Restatement (Second) of Contracts* § 224).  We may not construe a contract provision as a condition precedent to performance "unless that clearly appears to be the intention of the parties."  *Id.*  In addition, with respect to warranty language in particular, the UCC provides, "[w]ords or conduct relevant to the creation of an express warranty and words or conduct tending to

6

negate or limit warranty shall be construed wherever reasonable as consistent with each other . . . ."  13 Pa. Cons. Stat. § 2316(a).

Applying these principles to the present case, we agree with the District Court that the Supply Agreement is unambiguous and that paragraph F of Annex V is a condition precedent to BorgWarner's warranties.  Section 9(b) of the Supply Agreement first directs the reader to Annex V for an explanation of BorgWarner's warranties, which clearly states BorgWarner will "only" warrant turbochargers "that have a signed application sheet and that do not exceed their limits while in operation in the field."  J.A. vol. II, A103.  Section 9(b) then goes on to provide that "[n]otwithstanding" anything in the contract and Annexes to the contrary, BorgWarner will offer two warranties—the turbochargers will (1) be of good material and workmanship, and (2) conform to the specifications agreed upon by the parties.  *Id.* at A78.  In context, the "notwithstanding" clause merely promises two kinds of warranty protection, subject to the earlier-incorporated condition precedent requiring the turbochargers to have a signed application sheet (PAA).  Importantly, this reading of the contract harmonizes paragraph F of Annex V with the "notwithstanding" clause of Section 9(b), ensuring neither is rendered superfluous.

## B.

It is not disputed that BorgWarner waived the PAA condition with respect to its material and workmanship warranty, explaining to Mack on several occasions that even without a signed PAA, BorgWarner would warrant its turbochargers for defects in material and workmanship.  Mack contends BorgWarner should reimburse claims

7

allegedly caused by design defects because these claims fall within the scope of the material and workmanship warranty.

We may not rewrite the parties' contract for them or "give it a construction in conflict with . . . the accepted and plain meaning of the language used." *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984) (quoting *Hagarty v. William Akers, Jr. Co.*, 20 A.2d 317, 319 (Pa. 1941)). BorgWarner promised its products would "be of good material and workmanship." J.A. vol. II, A78. The parties did not define "material" or "workmanship" in their contract. Nor has the Supreme Court of Pennsylvania construed these terms in the context of warranties. Mack does not offer any Pennsylvania case law or evidence of the parties' intent to support the proposition that a material and workmanship warranty includes a warranty for the product's design. And Mack stretches the ordinary definition of "workmanship" by trying to fit "design" within it. Webster's Dictionary defines "workmanship" as "the art or skill of a workman," or "the execution or manner of making or doing something." *Webster's Third New International Dictionary Unabridged* 2635 (1961). A "workman," or "workingman," is defined as "one who works for wages usually at manual labor." *Id.* As made clear by its focus on the "manual" "execution" of a product, the definition of "workmanship" presupposes that the product being made or assembled has already been designed. Design is an earlier and distinct phase of product production not captured by the workmanship warranty.

Moreover, the parties' course of performance makes clear the specifications warranty—not the material and workmanship warranty—was intended to cover design defects. In Pennsylvania, "course of performance is always relevant in interpreting a

8

writing." *Atl. Richfield Co. v. Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978). "A course of performance . . . between the parties . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement and may supplement or qualify the terms of the agreement." 13 Pa. Cons. Stat. § 1303(d). And "the express terms of an agreement and any applicable course of performance . . . must be construed whenever reasonable as consistent with each other." *Id.* § 1303(e).

BorgWarner made clear to Mack representatives the material and workmanship warranty did *not* cover design defects. *See* J.A. vol. II, A192 ("Per our supply agreement, we do not grant design warranty on the 5176M series until the PAA is signed. However, I would like to make it clear that regardless of a supply agreement, all of our products are always warrantied for quality of manufacture, i.e. defects in materials and/or assembly."). And Mack repeatedly acknowledged internally it would not receive warranty coverage until a PAA was signed, belying its assertion now that design defects are covered by the material and workmanship warranty that BorgWarner repeatedly assured Mack applied regardless of a signed PAA.

The plain meaning of the "material and workmanship" warranty, in conjunction with the parties' course of performance, make clear the design warranty was captured by BorgWarner's promise the turbochargers would "conform to the specifications agreed upon by the parties" and not by its promise the turbochargers would "be of good material and workmanship." Since the parties never agreed on the specifications for turbochargers under the Supply Agreement, the specifications or design warranty never became effective.

9

## C.

Mack contends BorgWarner waived the PAA condition precedent to the design warranty by paying on some warranty claims. "To constitute a waiver of legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it . . . . It may be expressed or implied." *Brown v. City of Pittsburgh*, 409 Pa. 357, 360 (1962) (citations omitted); *see also Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 148 (3d Cir. 1999). "[A] course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance." 13 Pa. Cons. Stat. § 1303(f).

BorgWarner's payment on some warranty claims does not prove waiver of the PAA condition precedent to the design warranty because Mack failed to show BorgWarner's payments were made on design claims and not on the material and workmanship claims that BorgWarner had indisputably agreed to pay. Additionally, BorgWarner never wavered in its communications with Mack—BorgWarner consistently stated it would not provide design warranty coverage until a PAA between the parties was signed. Since there was no evidence of a clear and unequivocal act of waiver, Mack did not raise a genuine issue of material fact that BorgWarner waived the PAA condition precedent to the design warranty.

## D.

Mack also contends BorgWarner waived the PAA condition precedent to the design warranty by failing to negotiate the terms of the second PAA in good faith and by failing to offer commercially reasonable terms. Mack contends the specifications agreed

10

to by the parties in the conditional PAA were fixed and BorgWarner acted in bad faith by deviating from those specifications and adding warranty language in its proposals for a second PAA.

Every contract in Pennsylvania includes an implied covenant of good faith and fair dealing. *Benchmark Gr., Inc. v. Penn Tank Lines, Inc.*, 612 F. Supp. 2d 562, 583 (E.D. Pa. 2009). Pursuant to this principle, "a party to a contract cannot escape liability under his obligation on the ground that the other party has failed to perform a condition precedent to the establishment of such liability or to the maintenance of an action upon the contract, where he himself has caused that failure." *Shovel Transfer & Storage, Inc.*, 739 A.2d at 140 (quoting *Commonwealth v. Transam. Ins. Co.*, 341 A.2d 74, 77 (Pa. 1975)). Similarly, the UCC states a party with the power to specify the particulars of performance must do so "in good faith and within limits set by commercial reasonableness." 13 Pa. Cons. Stat. § 2311(a). "[E]xamples of 'bad faith' conduct include: 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.'" *Kaplan v. Cablevision of PA, Inc.*, 671 A.2d 716, 722 (Pa. Super. Ct. 1996) (quoting *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992)).

The evidence put forth by Mack, including the Lewis declaration, did not raise a genuine dispute that BorgWarner acted in bad faith during negotiations for the second PAA. We agree with the District Court that the evidence "shows only that BorgWarner offered to warranty turbochargers with operating limits that Mack considered

11

unacceptable in light of the investment it had already made in its engine design." *Mack Trucks, Inc.*, 2011 U.S. Dist. LEXIS 49132, at *3.

Mack offers no evidence to suggest the parties agreed to fix the specifications in the conditional PAA for the duration of the Supply Agreement. Evidence in the record actually suggests the contrary—that because of time constraints imposed by Mack, various warranty and specification provisions were unsettled at the time the parties signed the conditional PAA. Mack's evidence—including the Lewis declaration and the July 22, 2004 Roth email—showed only that BorgWarner was willing to sign a PAA with specification and warranty provisions Mack found unfavorable. This evidence supports an inference of poor planning and coordination between the parties but does not support an inference that BorgWarner acted in bad faith or in a commercially unreasonable manner. Mack did not raise a genuine issue of material fact that BorgWarner acted in bad faith or in a commercially unreasonable manner.

III.

We will affirm the District Court's grant of summary judgment in favor of BorgWarner on Mack's breach of contract and breach of warranty claims for alleged design defects.